**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE GLEN AT LAKEMOOR FARMS CONDO ASSOC., | ) | |
| Plaintiff, | ) | No. 24 C 2888 |
| v. | ) | Judge Sara L. Ellis |
| INSURANCE COMPANY OF GREATER NEW YORK, | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff The Glen at Lakemoor Farms Condominium Association ("Lakemoor") sought coverage from its property insurer, Defendant Insurance Company of Greater New York ("GNY") for alleged hail damage to the roofs of Lakemoor's twenty residential condominium buildings. After GNY denied Lakemoor's claim, Lakemoor filed this breach of contract lawsuit against GNY. GNY now moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. Because Lakemoor has identified disputed issues of material fact, the Court denies GNY's motion.

**BACKGROUND**

**I. Compliance with the Court's Summary Judgment Procedures**

This Court's summary judgment procedures differ from Local Rule 56.1, in that this Court requires the parties to submit a joint statement of undisputed facts and the party opposing summary judgment to submit additional facts it contends demonstrate a genuine issue of material fact in its response, not in a separate statement. Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/

OurKKJRDT+FUM5tZmA==; *see Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment procedures). Instead of working with Lakemoor to file a joint statement of undisputed facts, GNY ignored the Court's procedures and filed its own statement of facts in support of its motion for summary judgment. Following the Court's procedures, Lakemoor responded by including allegedly disputed facts in its response. GNY's decision to disregard the Court's procedures has deprived the parties and the Court from a clear understanding of the genuinely disputed facts in this case. In fact, it appears that the parties only dispute the inferences and ultimate conclusions to be drawn from the facts, not any proposed facts themselves, meaning that both sides' statements of fact should have been included in the required joint statement. While the Court overlooks GNY's violation in the interest of resolving the parties' arguments on their merits, it expects GNY to fully comply with the Court's procedures going forward.

## II. Factual Background[1]

### A. The Policy

GNY provided Lakemoor with a commercial first-party property insurance policy (the "Policy") effective from March 25, 2022 to March 25, 2023. The Policy provides that GNY "will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Doc. 1-1 at 89. The Policy covers loss or damage that "commenc[ed] . . . [d]uring the policy period." *Id.* at 104. The Policy provides that, in the event of loss or damage, GNY will "determine the value of Covered Property in the event of loss or damage . . . [a]t actual cash value as of the time of loss or

[1] The Court derives the facts set forth in this section from the statement of fact submitted by GNY to the extent it comports with Local Rule 56.1, the additional facts that Lakemoor included in its response brief, and the accompanying exhibits. The Court takes these facts in the light most favorable to Lakemoor, the non-movant.

damage." *Id.* at 100. The Policy includes optional coverage providing that "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form." *Id.* at 102. The policyholder retained the option to "make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis," with the Policy further providing that if the policyholder settled the loss on an actual cash value basis, it could still make a claim for replacement cost if it notified GNY of its intent to do so within 180 days after the loss or damage occurred. *Id.* at 103. The replacement cost provision further provides:

> d. We will not pay on a replacement cost basis for any loss or damage:
>
> > (1) Until the lost or damaged property is actually repaired or replaced; and
> >
> > (2) Unless the repair or replacement is made as soon as reasonably possible after the loss or damage.
>
> e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:
>
> > (1) The Limit of Insurance applicable to the lost or damaged property;
> >
> > (2) The cost to replace the lost or damaged property with other property:
> >
> > > (a) Of comparable material and quality; and
> > >
> > > (b) Used for the same purpose; or
> >
> > (3) The amount actually spent that is necessary to repair or replace the lost or damaged property.
>
> . . . .
>
> f. The cost of repair or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

*Id.*

### B. Lakemoor

Lakemoor, an Illinois condominium association, owns twenty residential condominium buildings in Lakemoor, Illinois. Construction of these buildings occurred between 2004 and 2006. All of the roofs of the buildings are original, except for that of Building 16, which had its roof replaced between March and October 2021. That year, Custom Roofing proposed replacing Building 16's roof for $15,275 and repairing other roofs, with the repairs to the nineteen other buildings totaling $12,575. Custom Roofing noted that the roofs reflected normal wear, and it did not make any notations of hail damage. Custom Roofing recommended a reinspection of the roofs in two years. Custom Roofing also provided proposals to replace the roofs on two other buildings in July 2021, which did not occur. Lakemoor's board determined what repairs to perform, based in part on its finances, and it did not necessarily perform all recommended repairs. A March 25, 2022 GNY underwriting summary for Lakemoor stated that the "roofs are inspected annually and serviced/repaired as needed," with "no reported or observed issues." Doc. 52-10 at 1. The summary further indicated that the roofs were "scheduled for replacement in 2023-2024." *Id.*

### C. Lakemoor's Claim and GNY's Denial

Overnight on July 22 and July 23, 2022, a hailstorm hit Lakemoor, allegedly damaging the roofs of all twenty buildings. Lakemoor retained a public adjuster, Fulcrum Claims Consulting ("Fulcrum"), in September 2022. On November 10, 2022, Lakemoor reported its claim of alleged hail damage. GNY retained Crawford Public Adjusters and Vince Fratinardo of Young & Associates Engineering Services ("YAES") to investigate the claim. Fulcrum and

YAES performed an initial inspection of the buildings on December 12, 2022. Inclement weather then delayed further inspections until March and April 2023.

On October 9, 2023, GNY sent a denial of coverage letter to Lakemoor. GNY found limited coverage for hail damage to roof vents, vent caps, and sheet metal fascia, but it concluded that this damage did not exceed the 1% wind/hail damage deductible of the Policy. GNY determined that the remaining damage to the roofs resulted from wear and tear, deterioration, neglect, and improper, inadequate, or defective materials, repairs, maintenance, and/or construction, as well as wind and hail damage that occurred over multiple dates, including many outside the Policy's effective dates. As such, GNY declined to cover any repairs to or replacement of the roofs.

Lakemoor has not replaced the roofs. Kyle Strathmann, the Lakemoor board president since November 2022, testified that Lakemoor lacked significant liquid assets and the cost of replacing all the roofs was more than what Lakemoor had in its reserves.

**D. Lakemoor's Experts**

Lakemoor retained Richard Henning, a meteorologist, to provide an opinion on meteorological conditions at the Lakemoor property on September 7, 2021 and July 23, 2022. Henning reviewed National Oceanic and Atmospheric Administration ("NOAA") records and National Weather Service data. From this data, Henning determined that on July 23, 2022, around 1:10 a.m., a storm dropped hail as large as 1.5 inches over Lakemoor for several minutes. Henning noted that hail of 1 inch or larger can cause significant damage. With respect to the September 7, 2021 storm, Henning assessed that some small hail of approximately 0.25 inches in diameter may have fallen at Lakemoor, with larger hail of approximately 1 inch falling at least 4 miles away from Lakemoor.

Fulcrum, Lakemoor's public adjuster, determined that the July 2022 storm caused the damage to the roofs. Fulcrum's principal, Anthony Rolfes, reviewed meteorological data and reports from HailTrace, which provides hail data verified by meteorologists. Fulcrum also visited the site to inspect the roofs. Given the black, fresh, non-oxidized asphalt on the roofs, which Rolfes testified was consistent with recent and not years-old impacts, Rolfes concluded that no other storm event could have caused the level of damage seen on the roofs. Fulcrum excluded the September 2021 hailstorm, treating it as minor and not verified by a meteorologist on HailTrace. Rolfes explained that one inch or larger hail on a three-tab roof would require full replacement because hail of such size compromises the roof.

Lakemoor also hired Gregory Kaszas, an engineer, to investigate the buildings and opine on hail-related damage. Kaszas performed an on-site inspection on June 27 and 28, 2024, visually inspecting ten of the twenty buildings. Kaszas also relied on Robert Easley's inspection results of the remaining buildings. Kaszas observed consistent conditions on all ten roofs he inspected, which Easley's photographs of the other ten buildings also reflected. Kaszas testified that it is "customary in the industry to look at a handful of buildings and form an opinion based off that." Doc. 52-1 at 16. Kaszas also conducted test-square analysis, reviewed CoreLogic hail reports, NOAA storm-event data, Henning's reports, and YAES' reports. Kaszas observed randomly distributed peppering or irregular shaped blemishes, as well as a loss of granules, on roof shingles that suggested hail damage. He also observed through fractures that resulted in direct openings allowing water to pass through the shingle, which he considered functional damage that required replacement. Kaszas opined that no prior hailstorms could have caused this damage to the buildings' roofs. He supported this opinion in part by pointing out that

Building 16, which had its roof replaced in 2021, showed the same hail damage pattern as the other buildings' roofs.

Andrew Behrens, an expert estimator, produced an estimate for the cost of repairing or replacing the rooftops. Behrens based this number on Kaszas' opinion that all twenty buildings needed complete roof replacements. His field inspector, Sean O'Malley, accessed the roofs of four or five Lakemoor buildings, obtained aerial drone photography of the buildings, and obtained information to establish the cost of repair for Kaszas' scope of work. Behrens estimated that using July 2022 pricing, it would cost approximately $1.6 million to replace all twenty roofs.

**E. GNY's Experts**

Dr. Jason Webster, a forensic meteorologist, investigated hail activity at Lakemoor since 2004. Webster identified seven dates on which Lakemoor experienced hail that equaled or exceeded 0.75 inches in diameter between January 1, 2004 and January 30, 2025: (1) May 11, 2011: hail up to 0.75 inches; (2) April 12, 2014: hail up to 0.75 inches; (3) May 11, 2014: hail between 0.75 inches and 1 inch; (4) April 25, 2016: hail between 1 inch and 1.25 inches; (5) April 10, 2017: hail between 0.75 inches and 1 inch; (6) August 8, 2019: hail up to 0.75 inches; and (7) July 23, 2022: hail between 1 inch and less than 1.25 inches. He indicated that the strongest storm to hit Lakemoor occurred on April 25, 2016.

In formulating its report for GNY, YAES relied on on-site inspections, various historical documents about the buildings, CoreLogic weather verification reports, and NOAA records. YAES found no hail damage on the rooftops of the twenty Lakemoor buildings, instead determining that the rooftops were in poor condition because of age-related wearing, expected degeneration, and minor hail-related wear from years of hail. Although YAES noted some hail

marks on the soft metals of the roofs, it determined that these hail marks did not impact the function of the metals. Fratinardo, YAES' roofing expert, acknowledged that hail from the July 2022 storm impacted Building 16, but he emphasized that the hail did not damage the roofs. Fratinardo also acknowledged that hail spatter "can be[ ] an indicator, which is well known in the practice of [roofing] evaluations, to indicate where a hail stone actually impacted that roof," further stating that analysis of spatter marks "is such a valuable aspect of hail damage evaluation." Doc. 46-10 at 8, 21.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue

of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I. Claim for Coverage

GNY argues that Lakemoor cannot prevail on its breach of contract claim. Lakemoor bears the burden of proving that its claim falls within the Policy. *Travelers Pers. Ins. Co. v. Edwards*, 2016 IL App (1st) 141595, ¶ 22. To recover under the Policy, Lakemoor must prove that "(1) a loss occurred, (2) the loss resulted from a fortuitous event, and (3) an all-risk policy covering the property was in effect at the time of the loss." *Johnson Press of Am., Inc. v. N. Ins. Co. of N.Y.*, 339 Ill. App. 3d 864, 871 (2003). Here, because the Policy covers loss or damage that "commenc[ed] . . . [d]uring the policy period," Lakemoor must show that the loss "commenced" between March 25, 2022 and March 25, 2023. Doc. 1-1 at 104. And more specifically, because Lakemoor's loss arises from a hailstorm, it must show that "(1) storm conditions of sufficient severity to have caused the damage alleged occurred in the vicinity of the damaged property during the time when the damage is alleged to have occurred, and (2) the storm caused the damage alleged." *Heritage Park Condo. Ass'n v. Greater N.Y. Mut. Ins. Co.*, No. 23 C 3916, 2025 WL 672912, at *2 (N.D. Ill. Mar. 3, 2025).

GNY does not dispute that a hailstorm occurred in July 2022. Instead, GNY argues that Lakemoor cannot establish that only the July 2022 storm caused the damage to the twenty roofs that requires their replacement, meaning that Lakemoor cannot prove that the claimed damages

commenced during the Policy period.[2] *See St. Michael's Orthodox Cath. Church v. Preferred Risk Mut. Ins. Co.*, 146 Ill. App. 3d 107, 111 (1986) ("Where part of a loss resulted from a peril insured against and part from a peril not covered by insurance, the insured must show the amount of the loss that is covered by his policy."). GNY relies on YAES' conclusion that any minor hail-related damage to the roofs occurred over many years and cannot be attributed solely to the July 2022 storm. It also points to the six other storms between January 2004 and January 2025 that produced hail that equaled or exceeded 0.75 inches at Lakemoor, suggesting that these other instances could have produced any hail-related damage to the Lakemoor roofs. GNY's evidence conflicts with the opinions rendered by Lakemoor's experts, however. After investigation, Fulcrum and Kaszas attributed the roof damage to the July 2022 storm. Among other evidence, Lakemoor also highlights that Building 16, which had its roof replaced in 2021, experienced the same damage as the older roofs, and that a policy renewal document prepared by GNY in early 2022 did not note that any of the roofs had hail damage. According to Lakemoor, this evidence eliminates the possibility of any pre-2021 storms contributing to the roof damage.

GNY's contention that Lakemoor did nothing to assess when the roof damage occurred or to distinguish other storm events improperly discounts Lakemoor's experts' reports. For example, GNY criticizes Kaszas' opinion because he personally assessed only ten buildings,

[2] GNY appears to read "commence" in the Policy to mean that the July 2022 storm must have been the "*only* storm that caused the damage that necessitates replacement" of the roofs. Doc. 53 at 3–4. The Policy does not define "commence," however, and so it could be read "to include each identifiable instance of new damage or loss, regardless of whether similar damage or loss, or damage or loss with a common but chronologically distinguishable cause, commenced prior to the policy period." *Temperature Serv. Co., Inc. v. Acuity*, No. 16 C 2271, 2016 WL 6037968, at *3 (N.D. Ill. Oct. 14, 2016). Under such a reading, while Lakemoor would have to separate out the amount of loss attributable to the July 2022 storm as opposed to damages related to uncovered losses, *see St. Michael's*, 146 Ill. App. 3d at 111, it would not completely preclude Lakemoor from a recovery on its claim. That said, because Lakemoor appears to argue that the July 2022 storm caused all of its damages, the Court does not address this issue further here and considers only whether Lakemoor has presented sufficient evidence that would allow a reasonable jury to find that only the July 2022 storm caused the damages at issue.

relied on others' investigations and photographs of the remaining ten buildings, and has no meteorologic training to properly analyze weather data. GNY also criticizes Henning for only looking at two hailstorm events. But GNY did not move to exclude Lakemoor's experts' opinions pursuant to Federal Rule of Evidence 702, and so the Court does not find it appropriate to exclude them altogether. As such, GNY's criticisms of Kaszas' and Hennings' opinions go to their weight, not their admissibility, leaving these opinions as evidence from which a jury could find for Lakemoor.[3] *See Godinez v. City of Chicago*, No. 16 CV 7344, 2019 WL 5290901, at *6 (N.D. Ill. Oct. 18, 2019) ("The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000))). As such, in light of Lakemoor's evidence suggesting that the July 2022 storm caused the damage to the roofs, the Court must submit the question to the jury. *See Heritage Park*, 2025 WL 672912, at *2–3 (allowing breach of contract claim related to damage from the same hailstorm to reach a jury based on plaintiffs' expert opinions); *Huntington Chase Condo. Ass'n v. Mid-Century Ins. Co.*, 379 F. Supp. 3d 687, 699 (N.D. Ill. 2019) ("Huntington has presented evidence that hail storms took place in May 2014

---

[3] In its reply, GNY also attacks the basis for Fulcrum's opinion, noting that Rolfes relied on weather reports from HailTrace despite not being a meteorologist and that Lakemoor did not disclose a HailTrace witness in the case. The Court initially questions why GNY did not make this argument in its opening memorandum as it did with respect to Lakemoor's other witnesses. *See Dexia Credit Local v. Rogan*, 629 F.3d 612, 625 (7th Cir. 2010) ("[A]rguments raised for the first time in a reply brief are waived."). Moreover, the Court fails to understand GNY's objection to Rolfes' reliance on HailTrace reports, given that GNY's own experts relied on similar publicly available reports in forming their opinions. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert; and it is apparent from the wording of Rule 703 that there is no general requirement that the other expert testify as well.").

and that these storms caused damage to the roofs and siding of its buildings. This is sufficient to establish a *prima facie* case on the issue of whether the loss resulted from a fortuitous event.").

## II. Limitation on the Amount of Recoverable Damages

Alternatively, GNY argues that, if Lakemoor prevails on liability, Lakemoor can only recover actual cash value, not replacement cost value, for the roofs. The Policy provides that, absent repair or replacement of the damaged property, the insured may only recover the actual cash value of the property as of the time of loss or damage. Lakemoor does not generally dispute that it cannot recover replacement costs without having replaced the roofs, but it argues that GNY's failure to cover the claim has prevented Lakemoor from undertaking the required repairs. As such, Lakemoor argues that the doctrine of prevention applies to allow it to recover replacement costs. *See Indus. Enclosure Corp. v. N. Ins. Corp. of N.Y.*, No. 97 C 6850, 2000 WL 1810087, at *1 (N.D. Ill. Dec. 8, 2000) ("In interpreting insurance policies, Illinois courts follow the rule that a party may not rely on a condition precedent when by its own conduct it made compliance with that condition impossible."). Lakemoor has presented evidence that it did not have sufficient funds to pay for the replacement of the roofs in its reserves and so needed GNY to cover its claim in order to replace the roofs. Lakemoor argues that to the extent that the facts demonstrate that GNY's denial of coverage prevented it from performing the repairs, it should be able to recover full replacement costs, not just actual cash value. *See id.* (rejecting argument that "if an insurer denies liability on a policy of this type, it *automatically* loses its right to object to recovery based on replacement cost" and stating that "the issue is a question of fact to be answered by the jury: did the denial of coverage make it impossible for plaintiff to comply with the repair or replacement condition").

GNY responds to Lakemoor's argument in two ways. First, it argues that the Court cannot rewrite the Policy, which does not allow for an insured to obtain replacement cost value where no repair or replacement has occurred. Courts have described the prevention doctrine as a well-settled principle that "insurers may not rely on a condition precedent when their own conduct 'has made compliance with that condition impossible.'" *LaSalle Nat'l Bank v. Mass. Bay Ins. Co.*, No. 90 C 2005, 1997 WL 211220, at *1 (N.D. Ill. Apr. 22, 1997) (quoting *State Farm Fire & Cas. Ins. Co. v. Miceli*, 164 Ill. App. 3d 874, 882 (1987)). But, as GNY points out, Illinois requires that "[t]he party advancing the doctrine . . . show that the events or circumstances which he claims rendered his performance impossible were not reasonably foreseeable at the time of contracting." *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 403 Ill App. 3d 1, 6–7 (2010). In other words, "[w]here a contingency that causes the impossibility might have been anticipated or guarded against in the contract, it must be provided for by the terms of the contract or else impossibility does not excuse performance." *Id.* at 7. The Court questions whether Lakemoor will be able to establish that the parties could not foresee the present situation or that Lakemoor could not replace the roofs because it lacked the funds to do so without GNY covering the claim, particularly given the indications in the record that Lakemoor had plans to replace the roofs on all but Building 16 in 2023 or 2024. *See Ill.-Am. Water Co. v. City of Peoria*, 332 Ill. App. 3d 1098, 1106 (2002) ("The doctrine of impossibility of performance requires that the circumstances creating the impossibility were not and could not have been anticipated by the parties, that the party asserting the doctrine did not contribute to the circumstances, and that the party demonstrate that it has tried all practical alternatives available to permit performance."). But given the factual inquiries involved in these questions, the Court

must leave them for the jury. *See Indus. Enclosure Corp.*, 2000 WL 1810087, at *1 (whether the denial of coverage made repair or replacement impossible is a question of fact for the jury).

Alternatively, GNY contends that Lakemoor cannot raise the prevention doctrine at this stage because Lakemoor never sought reformation of the Policy or pleaded that it could not comply with the Policy because of impossibility. GNY states that it did not take any discovery on the topic and so allowing Lakemoor to now argue the issue would prejudice GNY. While GNY focuses on Lakemoor's allegation that Lakemoor had substantially performed all conditions it had to perform under the Policy to obtain coverage, Doc. 6 ¶ 10, GNY ignores Lakemoor's subsequent allegation that "GNY's failure to pay Lakemoor the entire amount due and owing under the insurance policy has prevented Lakemoor from repairing or replacing the damaged property," *id.* ¶ 13. This sufficiently injected the prevention doctrine into the action. Lakemoor also provided damages opinions based on replacement value, which should have further suggested to GNY that Lakemoor seeks to recover replacement cost value, notwithstanding the Policy's language. To the extent that GNY believes it needs additional discovery to address the prevention doctrine, it may confer with Lakemoor and seek to reopen discovery for this limited purpose.

**CONCLUSION**

For the foregoing reasons, the Court denies GNY's motion for summary judgment [44].

Dated: September 23, 2026

SARA L. ELLIS
United States District Judge